## No. 3100
### Second Circuit

---

## JONES v. McCONNELL

(November 10, 1927. Opinion and Decree.)
(December 21, 1927. Rehearing Refused.)
(February 13, 1928. Certiorari Denied by Supreme Court.)

---

(*Syllabus by the Court*)

1. **Louisiana Digest—Appeal—Par. 625.**
The finding of the trial judge on an issue of fact will not be disturbed unless manifestly erroneous.
Colt vs. Willhite, 5 La. App. 151.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. Robert Roberts, Judge.

Action by J. J. Jones against Strubbe McConnell.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Harry V. Booth, of Shreveport, attorney for plaintiff, appellant.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellee.

REYNOLDS, J. Plaintiff sued defendant under the Workmen's Compensation Act for $14.04 a week for a period of 300 weeks beginning January 3, 1927, with legal interest on each installment from its maturity until paid, and for the further sum of $250.00 for medical fees, alleging that he was employed by defendant at a daily wage of $3.60 and working six days in the week, and that on the date named, while performing duties in the course of his employment, carrying building materials down a runway in an excavation, his right limb, below the knee, was caught in a shafting which crossed the runway, tearing and bruising certain muscles, ligaments and tendons of his said right limb to such an extent as to temporarily totally disable him to perform work of a reasonable character.

The defense was a general denial.

On these issues the case was tried and there was judgment in favor of the plaintiff and against the defendant for compensation for two weeks at the rate of $14.04 a week with legal interest thereon from January 10, 1927, and for the further sum of $2.70 for medical expenses incurred by plaintiff and for the costs of suit, and the plaintiff appealed.

### OPINION

Only issues of fact involved are presented, namely, the nature of the disability caused by the accident to plaintiff

and the amount of medical expenses incurred by him therefor.

Plaintiff, J. J. Jones, testified (evidence, pages 2, 7, 10, 11):

"Q. Mr. Jones, what were you doing on the 3rd day of January, 1927?

"A. I was toting material * * * and in going in and out there have to stoop over, stoop under the water pipe, * * * and in stooping over caught my clothes, caught me and most jerked me into this shaft.

"Q. What part of the shaft caught you —what part of your body was caught?

"A. Caught me on the calf of my leg.

"Q. Right leg?

"A. Yes, sir. The set screw was the first thing that hit the leg, right below the knee. I think was the first thing that hit my leg and most jerked me into the shafting.

* * * * *

"Q. Were you taken to the hospital?

"A. Yes, sir.

* * * * *

"Q. Who took you there?

"A. Mr. McConnell.

"Q. How long were you there?

"A. Stayed there I don't suppose more than an hour; taken me back home.

"Q. You stayed at the hospital about an hour and then they took you back home?

"A. Something like that.

"Q. Did you go to bed when you got home?

"A. Laying around.

"Q. How long did you stay in bed?

"A. Stayed in bed, off and on, laying around that way, something like about a week or ten days, up and down.

* * * *

"Q. Have you paid your medical bills?

"A. No, sir.

"Q. Who paid for it?

"A. The company, I suppose.

"Q. You have not been put to any expense?

"A. No, sir.

"Q. For doctor and medical treatment?

"A. Yes, I bought a little stuff to put on my leg myself; the doctor recommended that I put it on; I bought a rubber elastic.

"Q. That is all you bought?

"A. Yes, sir.

"Q. How much did you pay for the medicine?

"A. I think, if I am not mistaken, about, I think it was, don't know, won't be positive. I think I bought ten or twelve boxes of epsom salts.

"Q. How much did you pay for each box?

"A. Ten cents.

"Q. How much did you pay for the elastic?

"A. Dollar and a half.

"Q. All you have spent on account of this accident amounts to two dollars seventy cents.

"A. Yes, sir; about all I have paid out.

"Q. The rest of the treatment was furnished by the company?

"A. Yes, sir."

On this testimony the court rendered judgment as stated.

At the time of the trial the plaintiff was suffering from varicose veins.

Doctor C. H. Potts, called by plaintiff, testified (evidence, pages 12-14):

"Q. What is your conclusion as to this case?

"A. Well, I think he has a considerable amount of varicose veins, both above and below the knee, and the majority of which, the largest of which, above his knee form a pretty fair size sac or vein cyst. * * *

"Q. To what extent is he affected with varicose veins now?

"A. Considerable; he has quite large varicose veins, that is what I brought out a minute ago, the largest one of which is this cyst, the largest varicose vein above the knee and extending below."

Doctor A. J. Thomas, also called by the plaintiff, testified (evidence, page 23):

"Q. What was his condition upon your first examination, doctor?

"A. * * * Diagnosis made was varicose veins and peri phlebitis of right leg; periostits of middle third of tibia and fibula of right leg. * * *"

Doctor A. P. Crain, called by defendant, testified (evidence, pages 32, 33):

"Q. Did you examine the plaintiff in this case?

"A. Yes, sir.

"Q. Doctor, please state what you found to be his condition?

"A. * * * Mr. Jones has extreme varicosity, that is, varicose veins, in the veins of both limbs, extend above the knee, and the leg that was not hurt is almost as bad as the one injured. * * *"

And Doctors O. C. Rigby and W. S. Harmon, also called by defendant, testified to the same effect.

The testimony offered by plaintiff and defendant makes certain that at the time of the trial plaintiff was suffering from varicose veins and nothing else; and the only question to be decided by the court is, were the varicose veins the result of the accident?

Plaintiff's witness, C. H. Potts, testified (evidence, page 16):

"Q. Do you think that the injury which he received caused these varicose veins?

"A. I do.

"Q. You don't think he had them before that?

"A. May have had some, yes, but not to the degree he has got now.

"Q. Just what kind of injury would it have to be to cause varicosity?

"A. Any direct trauma to give him the symptoms he has here. * * *

"Q. If he had a trauma of that severe a degree, don't you think a man would have been in bed more than a week or ten days?

"A. Yes; he should have been in bed longer than that."

Plaintiff's witness, A. J. Thomas, testified (evidence, pages 28-31):

"Q. Did you notice the varicose veins in the left leg?

"A. Yes.

"Q. Are those veins normal or abnormal?

"A. Abnormal.

"Q. To what extent is it abnormal?

"A. That I cannot answer—it is like the hair turning gray—time does that.

"Q. For a man of his age and station and condition in life is his left leg abnormal?

"A. Yes, sir; it is.

* * * *

"Q. This man testified that he never had any trouble with varicose veins before the accident * * * would you have any reason to doubt that statement?

"A. No, sir, nothing unusual; you frequently see it—persons have veins in the same condition and don't really know it until the doctor examines them and tells them—they don't know they have them.

"Q. Do you think the lick that he got on the right leg produced those varicose veins?

"A. I would not say produce it—but certainly aggravated it.

"Q. Do you think this man had varicose veins before the accident, in the right leg?

"A. The veins were certainly abnormal, yes, sir.

"Q. To what extent do you think they were abnormal before the accident?

"A. Probably to the same extent they are in the left leg at present, prior to the injury."

A. P. Crain, called by plaintiff, testified (evidence, pages 32-43):

"Q. Doctor, please state what you found to be his condition?

"A. * * * I can find no connection between the varicosity and the injury and I think all his trouble now is due to varicose veins. * * * I think all the trouble this man has is due to an old varicosity which is now beginning to give him trouble and will always until he is operated on.

"Q. Doctor, when you say you think it is due to an old varicosity, do you mean to a varicosity that existed before the accident?

"A. I believe so, yes, sir.

"Q. What do you think the accident had to do with plaintiff's condition today?

"A. I don't think it has anything to do with it; I think the man is suffering from varicosity.

"Q. Well, doctor, you examined his leg?

"A. I did.

"Q. Did you find any evidence of such injury as could produce varicosity?

"A. I did not.

"Q. I believe you stated what kind of injury you found?

"A. Found a small scar on the inner side of the leg—could see a little discoloration.

\* \* \* \*

"Q. Can you cover up that scar with your finger tip?

"A. Yes, sir.

\* \* \* \*

"Q. Doctor, how could such an injury produce varicose veins?

"A. It could not do it.

\* \* \* \*

"Q. \* \* \* In other words, your theory is that this accident has no connection with the trouble in that leg?

"A. It has absolutely nothing to do with his varicose condition.

\* \* \* \*

"Q. Doctor, assuming that after a period of four weeks subsequent to that accident his leg was black over an area of four or five inches \* \* \* tell the court \* \* \* would you say the accident had nothing to do with his present condition?

"A. As I have just said, I don't think the accident had a thing in the world to do with the varicose veins.

\* \* \* \*

"Q. Then coming back, you cannot say, as a matter of fact, that this trauma had absolutely nothing to do with the man's condition at the present time?

"A. Absolutely and emphatically, my opinion is that the man's accident had nothing to do with the condition of his limb, with the varicose veins."

Thomas Ragan, called by defendant, testified (evidence, pages 46-50):

"Q. Doctor, the plaintiff claims that on January 3rd, 1927, \* \* \* he received a lick on his right leg just below the knee, and that as a result he is unable to do work; from your observation and examination of this man this morning are you prepared to state what his trouble is?

"A. He just has varicose veins—is all I can see.

"Q. Did you hear him describe his symptoms?

"A. Yes.

\* \* \* \*

"Q. Doctor, taking the injury as he has described it, and as you see it here, and from your examination, what effect, if any, did the accident and injury which the plaintiff received have on his present condition?

"A. I don't think it had any at all.

"Q. What connection is there between his injury and the varicose veins?

"A. None at all.

\* \* \* \*

"Q. Doctor \* \* \* from your observation of this man, do you think he had this varicose condition before he was hurt on January 3rd, 1927?

"A. Yes.

\* \* \* \*

"Q. Do I understand you to testify, doctor, that varicose veins develop gradually?

"A. Yes.

\* \* \* \*

"Q. Did the injury which he received contribute to the varicosities found?

"A. It could not have done so.

"Q. Now, doctor, \* \* \* only in rare cases where there was infection, or phlebitis, where a wound or bruise could cause varicose veins, can you tell from looking at his leg whether he received such wound or injury?

"A. It looks to have been a minor injury, and if it had caused any trouble at all it would have been in a little area in the immediate vicinity of that \* \* \* but since he has it extending even on the outside of the same leg and the other leg, it shows a systematic condition, which is the usual way those things develop.

\* \* \* \*

"Q. State if you can to the court how long the duration of the varicose veins of any pronounced manner on this man's right leg?

"A. Well it just looks to me from the condition I see now that he has had varicose veins for at least ten years.

"Q. Now, doctor, your theory is that a trauma could not cause the varicocele he is troubled with?

"A. Well, I don't see how it could, and there are no medical authorities that are of the opinion that it does."

O. C. Rigby, called by defendant, testified (evidence, pages 56-58):

"Q. Examined plaintiff?
"A. Yes.
"Q. Doctor, the plaintiff claims that he received an injury to his leg just below the knee on January 3rd, 1927, and that on account of the present condition of that leg he is unable to do any work of a reasonable character—what do you find the condition of his right leg to be.
"A. I saw him here just a few minutes ago, only time I have seen him to know him at all, and at this time I find general varicosity of all the superficial veins of the right and left leg too, extending as far as he pulled his socks down and as high up as he pulled his breeches up—and I find a general varicose condition.
"Q. I will ask you, did that injury and accident on January 3, 1927, from your observation of this man and what was stated, has that got any connection with this varicose condition?
"A. I would say, has none, because the varicose condition is general, not only in the right leg but the left leg as well; and if it had been connected with any injury at all there would have had to be infection, which would have caused him to have fever, chills and swelling and things like that, and possibly some breaking down of the veins; if there had been a lick or a blow to burst a vein right there, there would be some evidence there; but being down so far below and high up as you can go, the dilated blood vessels, why it could not have been caused from that particular lick or blow or whatever it was that stuck in there."

W. S. Harmon, called by defendant, testified to the same effect that Doctors Ragan and Rigby did.

We have read the record carefully and are unable to conclude that the finding of the trial court, that the disability from which plaintiff was suffering at the time of the trial, was not traceable to the accident and injury of January 3rd, 1927, is erroneous.

Plaintiff vigorously complains that he had been offered $250.00 by plaintiff by way of compromise of his claim against him and that he wanted to accept it but that the District Court refused to approve a settlement on that basis.

Be that as it may, this court is without authority to remedy that situation, however much it might desire to do so.

We are convinced that the judgment appealed from is correct under the law and the evidence and accordingly it is affirmed.